**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PENNSYLVANIA NATIONAL** | ) | |
| **MUTUAL CASUALTY INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0085-WS-M** |
| | ) | |
| **ROBERTS BROTHERS, INC.,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This declaratory judgment action comes before the Court on the Motion for Summary Judgment (doc. 20) filed by plaintiff, Pennsylvania National Mutual Casualty Insurance Company.  The Motion has been briefed and is ripe for disposition.

**I.     Background.**

The parties have submitted this dispute on summary judgment with a sparse evidentiary record.  Indeed, the only documents provided to the Court are the pleadings, copies of three insurance policies, a letter concerning a different claim and policy term, the underlying state-court complaint, and a docket activity printout in the state-court action.  The facts that may be gleaned from these fragmentary submissions are few.

*A.     The* **Tupa** *Action.*

On June 14, 2005, Tamara Tupa filed a lawsuit against Roberts Brothers, Inc. and others in the Circuit Court of Mobile County, Alabama, styled *Tamara Tupa v. Roberts Brothers, Inc. et al.*, Civil Action Number CV-05-2079 (the "*Tupa* Action").  Tupa alleged that, beginning in July 2000, she rented property located at 7910 Castlewood Court in Mobile, Alabama, and that Roberts Brothers "served as an agent for [the owner] concerning the property in question and was responsible for property management for the owner."  (*Tupa* Complaint, ¶ 6.)  The *Tupa* Complaint reflects that at various times beginning shortly after she moved in, Tupa gave notice to Roberts Brothers and others "that there was a problem with a sliding door at the rear of the property."  (*Id.*, ¶ 7.)  According to the *Tupa* Complaint, an intruder entered the home through

that sliding door on December 3, 2003, sexually assaulted Tupa, threatened to kill her, and subsequently escaped.  (*Id.*, ¶¶ 8-9.)  Tupa maintains that the intruder was able to enter the premises to perpetrate these offenses because of Roberts Brothers' failure to remedy the defective condition with the door and lock.  (*Id.*, ¶ 8.)  Based on these factual allegations, Tupa sued Roberts Brothers on state-law theories of negligence, wantonness, and breach of contract, all predicated on the notion that Roberts Brothers had notice of the defective condition of the sliding door and lock, yet it failed to correct the problem, fix the lock, and secure the premises. (*Id.*, ¶¶ 11-15.)[1]  The Court has been given no other specifics concerning the underlying facts, beyond the mere allegations of the *Tupa* Complaint.[2]

> **B.**     ***The Penn National Insurance Policies.***

At the time of the assault on Tupa, Roberts Brothers had two separate policies of insurance with Pennsylvania National Mutual Casualty Insurance Company ("Penn National"). The first was a Commercial General Liability policy numbered CL9 096662 ( the "CGL Policy"), whose term ran from April 1, 2003 through April 1, 2004.  (Complaint, Exh. B.)[3]  The

---

[1]     According to the Complaint in this case, Penn National is furnishing a defense to Roberts Brothers in the *Tupa* Action subject to a reservation of rights. (Doc. 1, ¶ 16.) Unfortunately, the summary judgment record was silent as to the status of the *Tupa* Action; therefore, on January 23, 2008, the undersigned entered an Order (doc. 30) directing Penn National to supplement the record with information as to whether the *Tupa* Action has gone to trial, settled, been dismissed, or otherwise been resolved.  Plaintiff's response, filed on February 7, 2008, confirms that Penn National continues to furnish a defense to Roberts Brothers in the *Tupa* Action, which remains pending in the Circuit Court of Mobile County, Alabama, and has been set for jury trial late next month.  (Doc. 33, ¶¶ 2-3.)

[2]     For example, neither party has submitted any information concerning any contractual relationship between Tupa and Roberts Brothers, or between Roberts Brothers and the property owner.  Nor has either party submitted deposition transcripts, affidavits, or other evidence concerning Tupa's allegation that she placed Roberts Brothers on notice of the defective sliding door.  Indeed, the parties have neglected to submit evidence of even the nature of that defect, whether the defect was reasonably repairable, and whether and how the intruder exploited that defect to commit criminal acts.  The parties have furnished the Court with literally no information about the underlying events other than the bare allegations of the state-court complaint.

[3]     In opposition to Penn National's Motion, Roberts Brothers argued that the CGL Policy appended to the Complaint as Exhibit B cannot be considered on summary judgment

CGL Policy provides coverage for amounts that Roberts Brothers "becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Doc. 1, Exh. B, at 76.)  Two endorsements and exclusions from the CGL Policy are at issue in this declaratory judgment action.  First, the CGL Policy includes an endorsement labeled "Exclusion - Designated Professional Services" (CG 21 16 07 98) providing that "[t]his insurance does not apply to 'bodily injury' ... due to the rendering of or failure to render any professional service," with "professional service" being specifically described in that endorsement as "real estate agents error and omissions."  (Doc. 1, Exh. B, at 58.)[4]  Second, the

---

because it is uncertified and incomplete.  Penn National sought to overcome this argument by "attaching another copy of its CGL policy to [its] reply as Exhibit 'A'."  (Doc. 27, at 1.) Unfortunately, Penn National appended the wrong policy.  Exhibit A to the reply brief is the iteration of the CGL Policy in effect from April 1, 2004 through April 1, 2005.  The incident in question occurred on December 3, 2003 and would appear to be governed by the 2003-2004 version of the CGL Policy, which affords coverage for bodily injury occurring "during the policy period."  (Doc. 1, Exh. B, at 76.)  As such, the 2004-05 version of the policy appears irrelevant to the coverage issues presented herein.  Even if it were not irrelevant, the policy form attached to the Reply Brief (doc. 27) as Exhibit A is materially incomplete (lacking, for instance, the entire Commercial General Liability Coverage Form).

Notwithstanding these defects with the policy exhibit attached to plaintiff's Reply as Exhibit A, the Court has overruled Roberts Brothers' objections to plaintiff's use of the policy form found at Exhibit B to the Complaint on summary judgment via separate Order (doc. 29) entered on January 23, 2008.  On that basis, the CGL Policy will be considered on summary judgment in the form appended as Exhibit B to Penn National's Complaint.  As for Roberts Brothers' contention that "[t]he lack of a complete policy precludes Roberts Brothers from fully responding to Plaintiff's arguments" (doc. 26, at 6), the Court cannot agree that defendant has been unfairly constrained in this regard.  If Roberts Brothers has a copy of the CGL Policy, then it could have attached the relevant portions as an exhibit to its own summary judgment submission.  To the extent that Roberts Brothers is insinuating that it lacks a complete copy of the subject policy, surely this document was available in discovery.  If Roberts Brothers requested it in discovery and never received it, then defendant should have requested judicial intervention to compel such disclosure long before now.  If Roberts Brothers never requested a copy of the policy in discovery, then defendant has only itself to blame for its alleged impairment in responding to movant's summary judgment arguments.  Either way, Roberts Brothers' predicament is of its own making.

[4]     Given the clear text of this exclusion, which specifically recites a "Schedule" listing "real estate agents error and omissions" under the heading "description of professional services," Roberts Brothers' contention that "[n]o professional service is shown in the schedule" (doc. 26, at 3) is both misleading and inaccurate.

CGL Policy includes a "Limitation of Coverage - Real Estate Operations" endorsement (CG 22 60 07 98) which provides in pertinent part as follows: "With respect to real estate operations, this insurance applies only to 'bodily injury' ... arising out of the ownership, operation, maintenance or use of ... [p]remises listed with you for sale or rental, if: a. You do not own, operate, manage or rent the premises; b. They are not in your care, custody, or control; or c. You do not act as agent for the collection of rents or in any supervisory capacity."  (Doc. 1, Exh. B, at 88.)[5]

The second policy of insurance that Penn National issued to Roberts Brothers for the time period in question was a Commercial Umbrella Liability Policy (the "Umbrella Policy") bearing number UL9 0096662, with effective dates from April 1, 2003 through April 1, 2004.  (Doc. 21,

---

[5]     Penn National also argues that Exclusion 2b. in form CG 00 01 1001 of the CGL Policy excludes coverage for any claim that Roberts Brothers is legally liable to pay, solely by reason of its assumption of liability in a contract or agreement.  (Doc. 21, at 2, 5-6.)  Movant does not identify where in this voluminous policy document such an exclusion might be found.  However, the Court has sifted through the entire 140-page policy excerpt (most of which is irrelevant to this dispute) appended to the Complaint as Exhibit B in vain for such an exclusion.  The problem, the Court suspects, is that Penn National neglected to submit the entire form CG 00 01 10001, but instead filed only pages 1, 3, 5, 9, 11, 13 and 16 of that form.  (Doc. 1, Exh. B, at 76-82.)  Without the requisite policy language before it, the Court cannot evaluate Penn National's summary judgment arguments pertaining to that provision.  It is of course a summary judgment movant's responsibility to ensure that the necessary policy provisions are part of the record on summary judgment.  Given Penn National's failure to satisfy this threshold requirement, the Court cannot and will not take up the legal issue of applicability of the contract exclusion to the requested coverage in the *Tupa* Action.  It would be folly for the Court to purport to construe policy provisions that it has never even seen.  The same reasoning defeats Roberts Brothers' contention that another endorsement, CG 22 70 11 85, not found in Exhibit B was actually part of the policy and should be considered on summary judgment.  Roberts Brothers likewise fails to submit the requisite section of the CGL Policy for the Court's consideration, and instead points to a letter from Penn National concerning another claim against Roberts Brothers for a different policy term.  (Doc. 26, Exh. A.)  Roberts Brothers would have the Court accept on faith that the policy language quoted in that letter concerning a different policy period and a different claim is precisely that stated in the 2003-2004 iteration of the CGL Policy, that the form language did not change between the 2003-2004 policy and the 2005-2006 policy, that the language in the letter constitutes the entire endorsement, and that there are no other provisions of that endorsement that might qualify, limit or alter the meaning of the out-of-context excerpt mentioned in the letter.  The Court will not make such an unsubstantiated assumption.  More generally, the Court's task on summary judgment is unnecessarily complicated by both parties' presentation of legal arguments on summary judgment concerning the proper interpretation of insurance policy provisions that neither side has placed in the record.

Exh. A, at 1.)  Two provisions of this Umbrella Policy are germane to the issues on summary judgment.  First, the Umbrella Policy contains a "Professional Liability Endorsement (Exclusion)" numbered 70 101, and stating that "this policy shall not apply to liability arising out of the rendering of or failure to render professional service, or any error or omission, malpractice or mistake of a professional nature committed or alleged to have been committed by or on behalf of the named insured in the conduct of any of the insured's business activities."  (Doc. 21, Exh. A, at 8.)[6]  Second, the Umbrella Policy has an "Other Insurance" condition stating as follows: "If other insurance applies to claims covered by this policy, the insurance under this policy is excess and we will not make any payments until the other insurance has been used up."  (*Id.* at 19.)

        *C.        The Declaratory Judgment Action.*

        On February 6, 2007, Penn National filed its Complaint (doc. 1) in this District Court, seeking a declaratory judgment against Roberts Brothers and Tupa.  The Complaint recounts Penn National's position that "Roberts is not entitled to liability coverage for any claims that may be asserted against it by Tupa."  (Complaint, ¶ 16.)  In the confusingly labeled "Requested Release" section of the Complaint (which presumably should read "Requested Relief"), Penn National asks this Court to "[d]eclare that the [Penn National] policies do not provide coverage for Roberts for the claims against it by Tupa" and to "[d]eclare that any possible coverage under the umbrella policy is subject to the 'other insurance' clause in the policy."  (*Id.* at 6.)  Roberts Brothers opposes this requested relief and maintains that coverage properly lies under the CGL Policy and the Umbrella Policy.  Penn National now seeks to have these coverage issues resolved by the Court as a matter of law pursuant to Rule 56, Fed.R.Civ.P.

**II.    Summary Judgment Standard.**

        Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

------

        [6]        The next page of the Umbrella Policy recites a similar exclusion for "Real Estate Agents, Consultants or Brokers Professional Liability (Exclusion)," bearing form number 70-2138 (Ed. 8/87) and providing that the policy shall not apply to liability for bodily injury "on account of any claim made against the Insured for breach of duty arising out of the rendering of or failure to render professional services in the conduct of the Insured's business as a real estate agent, real estate consultant, or real estate broker."  (Doc. 21, Exh. A, at 9.)

party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

III.   **Analysis.**

   A.   ***Plaintiff's Claims Relating to Indemnification Are Premature.***

   Implicit in Penn National's Complaint is a request that this Court enter a declaration both as to its duty to defend Roberts Brothers in the *Tupa* Action and its duty to indemnify Roberts Brothers from any adverse judgment in the *Tupa* Action. To date, however, no judgment has been entered in the *Tupa* Action and Roberts Brothers has made no payments to resolve Tupa's claims against it; therefore, Penn National's requests for a declaration as its duty to indemnify Roberts Brothers are plainly premature. *See, e.g., Employers Mut. Cas. Co. v. All Seasons Window & Door Mfg., Inc.*, 387 F. Supp.2d 1205, 1211-12 (S.D. Ala. 2005) ("It is simply inappropriate to exercise jurisdiction over an action seeking a declaration of the plaintiff's indemnity obligations absent a determination of the insureds' liability to the movants."); *State Farm Fire and Cas. Co. v. Myrick*, 2007 WL 3120262, *2 (M.D. Ala. Oct. 23, 2007) ("Resolving the duty to indemnify before the underlying case is concluded could potentially waste resources of the court because the duty to indemnify could become moot if the insured

prevails in the underlying lawsuit.").[7]  In light of these and other authorities set forth in an Order (doc. 30) entered on January 23, 2008, the Court indicated in that Order that "if the *Tupa* Action remains unresolved at this time, then Pennsylvania National's claim for declaratory judgment on the indemnification is properly dismissed without prejudice as premature," leaving as the sole remaining issue Penn National's duty to defend its insured in the *Tupa* Action.  (Doc. 30, at 2.) Plaintiff subsequently confirmed that the *Tupa* Action remains ongoing at this time; therefore, the duty to indemnify aspect of this action is due to be dismissed because Penn National's indemnification obligations to Roberts Brothers are hypothetical and contingent at this time.

       Notwithstanding the foregoing, and with no citations of authority, plaintiff now urges the Court to "reconsider its position concerning the ripeness of Penn National's duty to indemnify Roberts Brothers" on the grounds that "[t]he ripeness issue was not raised by Roberts Brothers in its response to Penn National's motion."  (Plaintiff's Supplement (doc. 33), ¶ 4.)  However, such issues are properly raised by the district court *sua sponte*, irrespective of whether a litigant has interposed them.  *See, e.g., Johnson v. Sikes*, 730 F.2d 644, 647 (11th Cir. 1984) ("The question of ripeness affects our subject matter jurisdiction ... and may be raised *sua sponte* at any time."); *Peachlum v. City of York, Pennsylvania*, 333 F.3d 429, 433 (3rd Cir. 2003) ("This court has recognized that considerations of ripeness are sufficiently important that the court is required to raise the issue *sua sponte* even though the parties do not."); *Utah v. U.S. Dep't of the Interior*, 210 F.3d 1193, 1196 n.1 (10th Cir. 2000) (because ripeness doctrine is drawn from constitutional limitations on judicial power and prudential reasons for refusing jurisdiction, "ripeness can be raised at any time, even by the court *sua sponte*"); *Sammons v. National Comm'n on*

---

[7]      *See also Allstate Ins. Co. v. Employers Liability Assur. Corp.*, 445 F.2d 1278, 1281 (5th Cir. 1971) ("no action for declaratory relief will lie to establish an insurer's liability in a policy clause contest such as the one at bar until a judgment has been rendered against the insured since, until such judgment comes into being, the liabilities are contingent and may never materialize"); *American Fidelity & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co.*, 280 F.2d 453, 461 (5th Cir. 1960) (observing in declaratory judgment action concerning insurance coverage that "it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass," such that court "was well within its considered judicial discretion to decline to express legal opinions on academic theoreticals which might never come to pass").

*Certification of Physician Assistants, Inc.*, 104 F. Supp.2d 1379, 1381 (N.D. Ga. 2000) ("As ripeness goes to this court's subject matter jurisdiction, the court must consider the question *sua sponte*."). "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) (explaining that ripeness enables courts to avoid becoming entangled in the hazards of premature adjudication). The reasoning of these cases is that, even where no litigant has asserted a ripeness defense, it is entirely appropriate for a district court to invoke that doctrine to conserve scarce judicial resources and avoid adjudicating speculative or theoretical disputes that may never be realized. Plaintiff's suggestion to the contrary is without merit.

In light of the foregoing, the Court deems it inappropriate at this time to enter a declaration as to Penn National's duty to indemnify Roberts Brothers in the *Tupa* Action. At present, it is purely a matter of speculation and hypothesis as to whether judgment will ever be entered against Roberts Brothers in those state-court proceedings. To decide now whether Penn National is responsible for footing the bill <u>if</u> the *Tupa* Action culminates in a monetary judgment against Roberts Brothers would run contrary to fundamental notions of judicial economy, wise judicial administration, and prudent allocation of scarce judicial resources. Accordingly, in the exercise of the Court's sound discretion, Penn National's claims for a declaratory judgment on the question of its duty to indemnify are **dismissed without prejudice**. The Court's summary judgment analysis will focus exclusively on the duty to defend dimension of the parties' dispute.

### B. Appropriate Legal Standard under Alabama Law.

The parties are in agreement that Alabama law governs the proper interpretation of the CGL Policy and Umbrella Policy. (*See* Plaintiff's Brief (doc. 21), at 5; Defendant's Brief (doc. 26), at 6.) Accordingly, this Court will apply Alabama law to the coverage issues presented in this dispute.

Alabama law generally imposes the burden of proof on policy coverage issues on the insured, while the burden of proving applicability of a policy exclusion rests with the insurer. *Compare Jordan v. National Acc. Ins. Underwriters Inc.*, 922 F.2d 732, 735 (11th Cir. 1991) ("Under Alabama law the general rule is that the insured bears the burden of proving coverage.") *with Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 12 (Ala. 2001) ("In general, the insurer bears

the burden of proving the applicability of any policy exclusion."). Exceptions to coverage are interpreted as narrowly as possible to maximize coverage, and are construed strongly against the insurance company that issued the policy. *See Porterfield v. Audobon Indem. Co.*, 856 So.2d 789, 806 (Ala. 2002).

Under Alabama law, "[t]he issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. ... If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court." *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003) (citation omitted); *see also B.D.B. v. State Farm Mut. Auto. Ins. Co.*, 814 So.2d 877, 879 (Ala.Civ.App. 2001) ("The interpretation of an insurance contract presents a question of law."). "General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract." *Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753, 780 (Ala. 2006); *see also Progressive Specialty Ins. Co. v. Naramore*, 950 So.2d 1138, 1141 (Ala. 2006) ("Insurance contracts are to be enforced as they are written, as long as there is no ambiguity in the provisions involved.") (citations omitted); *Shrader v. Employers Mut. Cas. Co.*, 907 So.2d 1026, 1034 (Ala. 2005) ("If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy ... by making a new contract for the parties.") (citation omitted).

The determination of whether policy language is ambiguous or unambiguous is critical. "To the extent the language of an insurance policy provision is ambiguous, all ambiguities must be resolved against the insurance company." *Safeway Ins. Co. of Alabama, Inc. v. Herrera*, 912 So.2d 1140, 1143 (Ala. 2005). That said, ambiguities cannot be constructed from thin air by "strained or twisted reasoning" in interpreting the language. *Id.* Furthermore, "the mere fact that a word or phrase used in a provision in an insurance policy is not defined in the policy does not mean that the word or phrase is inherently ambiguous." *Id.* Rather, "[i]n determining whether the language of a contract is ambiguous, courts construe the words according to the interpretation ordinary men would place on the language used therein. ... The words are given the meaning that persons with a usual and ordinary understanding would place on the words." *Naramore*, 950 So.2d at 1141 (citations and internal quotations omitted); *see also Herrera*, 912 So.2d at 1143 (similar). If a given exclusion is ambiguous, it "will be construed so as to limit the exclusion to the narrowest application reasonable under the wording." *Porterfield*, 856 So.2d at

-9-

806 (citation omitted).

As mentioned, the sole remaining claim in this action concerns Penn National's duty to defend its insured in the underlying case. In determining the scope of this duty to defend, several principles of Alabama law are relevant. The law is clear that an "insurer's duty to defend is more extensive than its duty to [indemnify]." *Tanner v. State Farm Fire & Cas. Co.*, 874 So.2d 1058, 1063 (Ala. 2003) (citation omitted); *see also Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So.2d 1006, 1011 (Ala. 2005) (explaining that broad duty to defend arises from principle that ambiguous insurance policies must be construed liberally in insured's favor). Furthermore, "[w]hether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint." *Tanner*, 874 So.2d at 1063. However, a court is not constrained to the allegations of the underlying complaint, but may additionally look to facts which may be proved by admissible evidence. *Id.* at 1064. The Alabama Supreme Court has succinctly summarized the applicable test for gauging the existence of a duty to defend as follows: "The insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between insurer and insured prove a covered accident or occurrence." *Id.* at 1065. If both covered claims and non-covered claims are pleaded, then the insurer's duty to defend extends at least to those covered claims. *Id.*

The Court's examination of the legal issues presented by the parties concerning the CGL Policy and the Umbrella Policy proceeds in recognition of these principles.

### C.     *The Professional Service Exclusions in the CGL and Umbrella Policies.*

Penn National maintains that the professional services exclusions set forth in both the CGL Policy and the Umbrella Policy foreclose coverage for Roberts Brothers in the *Tupa* Action. The wording of these exclusions is very similar. As described *supra*, the CGL Policy's professional services exclusion provides that coverage is excluded for bodily injury "due to the rendering of or failure to render any professional service," which the exclusion specifically describes as "real estate agents error and omissions." Likewise, the Umbrella Policy's professional services exclusion bars coverage for "liability arising out of the rendering or failure to render professional service, or any error ... of a professional nature." Penn National argues that Roberts Brothers' maintenance of the rental home occupied by Tupa constitutes a

"professional service" triggering those exclusions, as Roberts Brothers' alleged failure to maintain the home "arises out of its performance of its profession as a real estate agent." (Plaintiff's Brief (doc. 21), at 7.)  Roberts Brothers counters that the term "professional services" is ambiguous because it is not defined in the policies, that the term does not reasonably encompass the activities that are the subject of the *Tupa* Action, and that there are questions of fact as to whether particular acts and omissions do or do not amount to professional services. (Opposition Brief (doc. 26), at 9-13.)

     As an initial matter, the Court disagrees with Roberts Brothers' suggestion that the lack of an express definition of the term "professional services" in the policy language necessarily renders these exclusions ambiguous.  *See, e.g., Herrera*, 912 So.2d at 1143 (phrase in insurance policy is not inherently ambiguous simply because policy does not define it).  It is similarly incorrect to maintain, as Roberts Brothers does, that whether a given activity is or is not a "professional service" always amounts to a question of fact.  In Alabama, the interpretation of insurance policies is for courts to decide in the first instance, and policy terms must be given their ordinary meaning.  *See id.*  Thus, if the activities for which Tupa seeks to hold Roberts Brothers liable in the underlying action fall within the usual and ordinary meaning of the term "professional services," then the exclusion applies and no question of fact is presented.[8]

     An extensive body of law has developed concerning the meaning of the term "professional services" as used in exclusions such as those at issue here.  Although Alabama jurisprudence on this topic is limited, courts in other jurisdictions have frequently defined that term as follows:  "[A] 'professional act or service' is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor or skill, and the labor or skill

---

     [8]     In arguing otherwise, Roberts Brothers relies on *U.S. Fidelity and Guar. Co. v. Armstrong*, 479 So.2d 1164 (Ala. 1985), which is distinguishable.  In *Armstrong*, the evidence was that the insured's underlying conduct included both professional and non-professional services, such that there were questions of fact as to the causation question of which of these types of services actually caused the injury for which coverage was sought.  *Id.* at 1169.  By contrast, the only activity of Roberts Brothers' at issue is its alleged failure to repair a defective sliding door at Tupa's home despite notice of same.  Whether arranging for repair of a sliding door on a rental house is a "professional service," as that term is used in the Penn National insurance policies, is a legal question for the Court to decide.

-11-

is predominately mental or intellectual rather than physical or manual."  *American Economy Ins. Co. v. Jackson*, 476 F.3d 620, 625 (8th Cir. 2007) (citation omitted).[9]

The *Tupa* Complaint contains no facts that might reasonably support a conclusion that Tupa is suing Roberts Brothers for acts or services involving specialized knowledge, labor or skill.  Simply stated, Tupa claims that she told Roberts Brothers (as property manager) that there was a problem with her sliding door, and that Roberts Brothers failed to fix it.  Nothing in the *Tupa* Complaint suggests that Roberts Brothers ever inspected the sliding door and, in reliance on specialized skill and professional judgment, made a considered determination that repair was unnecessary, impossible or otherwise untenable.  All appearances are that Tupa is suing Roberts Brothers for an administrative oversight, not a professional judgment call.  Under no ordinary common-sense meaning of the term is it a "professional service" for a property manager to perform (or fail to perform) the strictly clerical task of picking up the telephone to call a handyman to repair a broken door.  This omission forms the sole basis of the claims against Roberts Brothers in the underlying lawsuit.  Whatever such an omission may or may not be, it clearly does not arise from a vocation involving specialized knowledge, labor or skill, and it cannot reasonably fit within the definition of a professional service as that term is used in exclusions in both the CGL Policy and the Umbrella Policy.  *See generally Guaranty Nat'l Ins.*

---

[9]       *See also Evanston Ins. Co. v. Budget Group Inc.*, 2006 WL 2828174, *1-2 (11th Cir. Oct. 5, 2006) (under Florida law, professional services exclusion is confined to persons who belong to learned profession or whose occupations require a high level of training and proficiency, such as attorneys, psychiatrists and medical technicians, such that renting vehicles to the public is not a professional service); *Bohreer v. Erie Ins. Group*, 475 F. Supp.2d 578, 585 (E.D. Va. 2007) (under Virginia law, application of professional services exclusion requires court to determine "whether the action arises out of a service that exacts the use or application of special learning or attainments of some kind," such that exclusion would reach any service inextricably intertwined with any such professional services); *Stone v. Hartford Cas. Co.*, 470 F. Supp.2d 1088, 1098 (C.D. Cal. 2006) (professional services are acts that require specialized intellectual knowledge, labor and skill, such as drafting architectural plans for home construction project); *Western World Ins. Co. v. American and Foreign Ins. Co.*, 180 F. Supp.2d 224, 231 (D. Me. 2002) (similar); *American Motorists Ins. Co. v. Southern Sec. Life Ins. Co.*, 80 F. Supp.2d 1285, 1289 (M.D. Ala. 2000) (applying Florida law, and construing term "professional act or service" to mean "one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor skill involved is predominantly mental or intellectual, rather than physical or manual").

*Co. v. North River Ins. Co.*, 909 F.2d 133, 137 (5th Cir. 1990) (under Texas law, professional services exclusion does not apply to claims that insured hospital failed to maintain patient's window properly by safeguarding the window through screws in window sashes rather than fixed, protective screens, inasmuch as that was an administrative decision, not a professional service); *Shelley v. Moir*, 405 N.W.2d 737, 739 n.2 (Wis.App. 1987) (noting that "[r]epair and maintenance of property might not normally be considered 'professional services'" within meaning of policy exclusion but that policy in question specifically defined professional activities to include "property management").[10]

For these reasons, the Court concludes that Penn National has failed to satisfy its burden of proving that the professional services exclusions in the CGL Policy and Umbrella Policy provide a bar to coverage in this case.  Given that the clerical/administrative acts and omissions at issue in the *Tupa* Action do not fall within the usual and ordinary meaning of the term "professional services," and given the canon of construction that policy exclusions must be construed strictly against the insurer, Penn National's Motion for Summary Judgment is not well-taken to the extent that it seeks to avoid a duty to defend in the underlying action pursuant to both policies' professional services exclusions.[11]

---

[10]     This conclusion is reinforced by the CGL Policy endorsement that lists Roberts Brothers' "Designated Professional Services" as "1. Real Estate Agent Errors and Omissions" and "2. Financial Investment Error and Omissions."  (Doc. 1, Exh. B, at 58.)  A property manager's failure to call a repairman to fix a lock does not fall within the plain meaning of either of these types of enumerated services, inasmuch as neither real estate agents nor financial investment professionals would be expected to perform such duties.  Stated differently, Roberts Brothers was clearly not wearing its "real estate agent" hat or its "financial investment" hat when performing the acts and omissions underlying the state-court action; therefore, the professional services exclusion in the CGL Policy is inapplicable to the claims asserted against Roberts Brothers in the *Tupa* Action.

[11]     In so concluding, the Court rejects Penn National's argument that the conduct at issue should fall within the "professional services" exclusion because it constitutes the sort of "special risk" that is aligned with the purposes of an errors and omission policy, rather than the sort of "customary business risk" which CGL policies are designed to cover.  (Doc. 21, at 7-8.)  Such talk of general purposes of different types of insurance is unhelpful and unavailing.  If Penn National wished to limit its liability to certain kinds of risk, it was incumbent upon Penn National, as insurer and drafter of the CGL Policy, to craft the policy language in such a way to effectuate that intention.  Where an insurer has failed to do so (as Penn National has with respect

##### D.     The Real Estate Operations Limitation in the CGL Policy.

Penn National next contends that the CGL Policy does not obligate it to defend Roberts Brothers in the *Tupa* Action, as a matter of law, because it contains a "real estate operations" limitation.  That endorsement provides that "[w]ith respect to real estate operations, this insurance applies only to 'bodily injury' ... arising out of the ownership, operation, maintenance or use of: (1) Such part of any premises you use for general office purposes; and (2) Premises listed with you for sale or rental, if: a. You do not own, operate, manage or rent the premises; b. They are not in your care, custody, or control; or c. You do not act as agent for the collection of rents or in any supervisory capacity."  Penn National's position is that the plain language of this endorsement negates any defense obligation owed to Roberts Brothers here.

The parties do not dispute that Tupa's claims against Roberts Brothers allege bodily injury arising from negligent property management.  Tupa is not suing Roberts Brothers for improper management of premises that Roberts Brothers used for general office purposes, or for negligence in connection with premises listed with Roberts Brothers for sale or rental that it does not own, operate, control or manage.  As such, the critical inquiry becomes whether Roberts Brothers' property management services at the home rented by Tupa qualify as "real estate operations."  If so, then that limitation on its face would preclude coverage for the allegations of the *Tupa* Complaint and obviate any duty to defend.  The Court answers this question in the affirmative.[12]

Although the term "real estate operations" is not defined in the CGL Policy, it would embrace real property management services under any common-sense, ordinary construction of the term.  Indeed, "real estate operations" on its face has a broader connotation than merely

---

to its professional services exclusions), it cannot fall back on generalities concerning the relative purposes of an errors and omissions policy and a CGL policy to avoid coverage.

[12]     *See State Farm Lloyds v. Goss*, 109 F. Supp.2d 574, 577 (E.D. Tex. 2000) (construing similar "real estate operations" limitation to exclude coverage of insured's real estate property if insured owns, operates or manages it in a manner inconsistent with merely showing it to prospective buyers); *State Farm Fire & Cas. Co. v. Bohlen*, 976 S.W.2d 594, 596 (Mo.App. E.D. 1998) (holding that similar "real estate operations" limitation excuses insurer from coverage where underlying action alleged that insured was negligent in managing and controlling the property where injury occurred).

buying, selling and listing properties, and the act of managing or operating a real property lies well within the purview of that term as it is usually and ordinarily understood.  Courts in a variety of factual and legal contexts have routinely classified property management as a form of real estate operations.  *See generally Joyce v. John Hancock Financial Services, Inc.*, 462 F. Supp.2d 192, 196 (D. Mass. 2006) (describing "real estate operations department" of financial services company as a department that manages and operates properties); *MB Financial Bank, N.A. v. MB Real Estate Services, LLC*, 2003 WL 21462501, *6 (N.D. Ill. 2003 June 23, 2003) (characterizing as "commercial real estate business" a company's operations as property manager of 22 commercial buildings in Chicagoland area); *Gottsegen v. Hart Property Management Inc.*, 820 So.2d 1138, 1143 (La. App. 5 Cir. 2002) ("In general, the business of a real estate company is more closely associated with sales, rental, and property management."); *Idylwoods Associates v. Mader Capital, Inc.*, 915 F. Supp. 1290, 1295 (W.D.N.Y. 1996) (describing employee responsible for company's real estate operations as handling maintenance, sales and marketing of property).[13]  Under any reasonable reading of the CGL Policy, then, Roberts Brothers' property management services at the Tupa rental home constitute "real estate operations" within the scope of that coverage limitation.

To avoid both the common-sense meaning of the term "real estate operations" and the authority recognizing property management as a form of real estate operations, Roberts Brothers propounds three arguments.  First, it urges the Court to read the real estate operations limitation in conjunction with the statement on the declaration page describing Roberts Brothers' business as "real estate agents."  (Doc. 1, Exh. B, at 2.)  According to Roberts Brothers, "real estate operations" should be read as meaning "real estate <u>agent</u> operations" because of that business description in the CGL Policy.  This argument proves too much.  If Roberts Brothers is correct that the "business description" portion of the declaration page is the benchmark against which all policy coverages, limitations and exclusions are measured, then coverage is obviously lacking

---

[13]     No party has submitted evidence as to the meaning of "real estate operations"; however, a cursory Internet search of the terms "real estate operations" and "property management" reveals a recurring link between the two, and reflects a common understanding both in the industry and among lay persons in ordinary parlance that property management is a subset of real estate operations.  This nexus reinforces the foregoing authorities.

for the *Tupa* Action because, as Roberts Brothers itself recognizes, the claims in that case do not concern its real estate <u>agent</u> operations.  Besides, defendant's construction of the policy language is unreasonable.  Nothing in the CGL Policy would warrant equating "real estate operations" with "real estate agent services"; rather, Roberts Brothers is simply seizing on unrelated aspects of the CGL Policy to derive a far more restrictive definition of "real estate operations" than the plain meaning of the term or the text of the CGL Policy can support.  Given its obligation to construe the term "real estate operations" in accordance with its usual and ordinary meaning, the Court will not utilize twisted or strained reasoning to conflate that term with the business description recited on the declarations page of the CGL Policy.  *See State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 309 (Ala. 1999) (when a court construes an insurance policy, "the terms of an insurance policy should be given a rational and practical construction"); *Lambert v. Coregis Ins. Co.*, 950 So.2d 1156, 1161 (Ala. 2006) (citing well-established rule that litigants cannot create nonexistent ambiguities through use of strained or twisted reasoning).

Second, Roberts Brothers insists that there are questions of fact as to whether property management services fall within the definition of "real estate operations" as that term is used in the CGL Policy.  The record does not support this contention.  Roberts Brothers comes forward with no evidence of any kind tending to show genuine issues of material fact as to whether the acts and omissions at issue in the *Tupa* Action constitute real estate operations.  More fundamentally, defendant once again ignores the black-letter principle that the interpretation of an insurance policy is a question of law for the court to decide.  *See, e.g., American and Foreign Ins. Co. v. Tee Jays Mfg. Co.*, 699 So.2d 1226 (Ala. 1997) (explaining that it is court's province "to construe a policy, even though ambiguous and unclear but not void for uncertainty, where its interpretation must come from the writing itself").  If property management services for rental homes fall within the ordinary meaning of the term "real estate operations," then the limitation bars coverage.  No fact-finding is necessary to make that determination.  Thus, Roberts Brothers' unsupported, vague contention that issues of fact preclude construction of the real estate operations limitation on coverage at the summary judgment stage is unfounded.

Third, Roberts Brothers contends that when the CGL Policy is construed as a whole, the meaning of the "real estate operations" limitation becomes ambiguous.  It is certainly correct that courts must examine an insurance policy as a whole, rather than isolating particular portions and

interpreting them out of context.  *See, e.g., American Resources Ins. Co. v. H & H Stephens Const., Inc.*, 939 So.2d 868, 873 (Ala. 2006) ("a court cannot consider the language in the policy in isolation, but must consider the policy as a whole") (citations omitted); *Slade*, 747 So.2d at 309 (same).  According to Roberts Brothers, ambiguity arises from the fact that the CGL Policy includes among the named insureds four people described as "managers/lessors of premises" located at 3662 Dauphin Street in Mobile, Alabama.  (Doc. 1, Exh. B, at 52.)  The insured's point is that the provision extending coverage to "managers/lessors of premises" cannot be reconciled with an interpretation of the "real estate operations" limitation as excluding coverage for bodily injury arising from Roberts Brothers' property management services.  This argument fails for the following reasons: (a) this action does not involve the property at 3662 Dauphin Street or the four individuals named as additional insureds on page 52 of the CGL Policy, so the status of coverage for those persons and property is irrelevant; (b) Roberts Brothers would have the mere listing of four "managers/lessors" among additional insureds erase, rewrite and supersede the plain language of the real estate operations limitation; and (c) Roberts Brothers disregards the fact that the CGL Policy provides coverage beyond "real estate operations," such that the four "managers/lessors" could enjoy coverage under the policy in certain respects even as such coverage remained bounded by the real estate operations limitation.[14]  In short, Roberts Brothers is attempting to create an ambiguity where there is none, and is relying on strained reasoning to do so.  Alabama law precludes Roberts Brothers from circumventing the clear meaning of its insurance policy in this fashion.  *See Lambert*, 950 So.2d at 1161.[15]

---

[14]    Indeed, Roberts Brothers' argument disregards the CGL Policy's endorsement labeled "Additional Insured - Managers or Lessors of Premises," which provides that managers and lessors listed in the schedule (such as the four managers/lessors named on page 52 of the CGL Policy) are additional insureds "only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you."  (Doc. 1, Exh. B, at 140.)  On its face, then, the CGL Policy extends coverage to managers and lessors <u>only</u> for the ownership, maintenance or use of premises that have been leased to Roberts Brothers.  This provision dovetails with the common, ordinary meaning of the "real estate operations" limitation.  As such, there is no inconsistency between the listing of four managers as additional insureds and the plain meaning of the "real estate operations" limitation as discussed above.

[15]    On this issue, Roberts Brothers would also rely on endorsement CG 22 70 11 85, which the Court has already pointed out is not set forth in the copy of the CGL Policy submitted

In short, the plain language of the "real estate operations" provision of the CGL Policy conclusively defeats Penn National's obligation to furnish a defense to Roberts Brothers pursuant to that policy in the *Tupa* Action.  The Court finds that property management services are within the plain ordinary meaning of "real estate operations" as that term is used in the policy.  The Court further finds that this provision limits coverage for bodily injury arising from real estate operations to premises that Roberts Brothers uses for general office purposes and premises listed with it for sale or rental that Roberts Brothers does not own, operate, manage, or control.  As the allegations of the *Tupa* Action would hold Roberts Brothers liable for real estate operations that do not fall within the limited coverage provided by the CGL Policy for such activities, the Court concludes that Penn National owes no duty to defend Roberts Brothers pursuant to that policy, as a matter of law.

### E.    *The Other Insurance Limitation in the Umbrella Policy.*

Finally, Penn National seeks a declaration that the Umbrella Policy's coverage for Roberts Brothers is excess to any other coverage (including specifically errors and omissions policy coverage) that Roberts Brothers may have.[16]  The Umbrella Policy includes an "Other

---

by the parties and is not properly before the Court.  (*See* footnote 5, *supra*.)  For the reasons already stated, this argument will not be considered.  Even if it were considered, however, this contention would fail.  Roberts Brothers says that there was an exclusion in the CGL Policy providing that "[w]ith respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess."  (Doc. 26, at Exh. A.)  According to Roberts Brothers, this provision creates ambiguity when read alongside the "real estate operations" limitation because the former suggests that coverage is available for management services while the latter indicates that no such coverage is available.  This conflict is illusory.  The endorsement labeled "Additional Insured - Managers or Lessors of Premises" outlines circumstances under which property managers are afforded coverage under the CGL Policy, and is not inconsistent with the "real estate operations" limitation.  The endorsement cited by Roberts Brothers merely provides that such coverage is excess.  The Court will not accept Roberts Brothers' strained and selective readings of particular policy provisions to inject uncertainty into an unambiguous limitation on coverage in the "real estate operations" section of the CGL Policy.

[16]    Penn National also maintains that the Umbrella Policy's coverage is inapplicable because of the "professional services" exclusion set forth therein.  The Court having already rejected that argument, the only issue remaining as to the Umbrella Policy is the impact, if any, of the "other insurance" limitation on coverage.

Insurance" condition stating as follows: "If other insurance applies to claims covered by this policy, the insurance under this policy is excess and we will not make any payments until the other insurance has been used up."  There is no evidence of record as to whether Roberts Brothers in fact has any other coverage that might trigger the "other insurance" clause of the Umbrella Policy.  Nonetheless, the parties are in agreement that, to the extent such other insurance exists, the Penn National Umbrella Policy provides excess coverage.[17]  On that limited basis, and without making any findings or expressing any opinions as to the existence of any such "other insurance," the Court will enter declaratory judgment in Penn National's favor.

F.      *The Umbrella Policy's Professional Services Exclusion.*

The procedural posture of this action is now somewhat unusual.  The Court has held as a matter of law that (1) the CGL Policy does not obligate Penn National to defend the claims against Roberts Brothers in the *Tupa* Action and (2) the Umbrella Policy is excess to any other insurance that may apply to those claims.  But Penn National's Complaint (doc. 1) also includes a claim that the Court declare that no defense is owed Roberts Brothers in the *Tupa* Action under Penn National's Umbrella Policy because of the "professional services" exemption.  This purely legal issue has been fully briefed and decided in this Order in a manner adverse to Penn National, but defendants did not file a cross-motion for summary judgment.  Inasmuch as this legal issue has been fully developed and decided by this Court, such that there is no conceivable need for this action to proceed to trial, the Court hereby **grants** summary judgment to defendants on the question of whether the professional services exclusion of the Umbrella Policy defeats the insurer's duty to provide a defense in the underlying proceedings.  *See generally Artistic Entertainment, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) ("where a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided").

---

[17]      In particular, Roberts Brothers expressly "concedes that the umbrella policy in question provides excess coverage to the claims at issue if other insurance provides coverage." (Opposition Brief (doc. 26), at 16.)  And Penn National theorizes that the Umbrella Policy's coverage "would be excess to the professional liability coverage" if in fact Roberts Brothers possesses such coverage.  (Plaintiff's Brief (doc. 21), at 11.)

IV.     **Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** that plaintiff's claims for declaratory judgment on the question of its duty to indemnify Roberts Brothers in the underlying action are **dismissed without prejudice** as premature.  With respect to plaintiff's claims for declaratory judgment concerning the duty to defend, plaintiff's Motion for Summary Judgment (doc. 20) is **granted in part**, and **denied in part**.  The Motion is **granted** in the following respects:

1.     The Court **finds** and **declares** that Penn National owes no duty under the commercial general liability insurance policy number CL9 0096662 to defend Roberts Brothers in the underlying state-court litigation brought by Tamara Tupa and styled *Tamara Tupa v. Roberts Brothers, Inc. et al.*, Civil Action Number CV-05-2079 (Mobile County Circuit Court), such duty being extinguished by the "real estate operations" limitation.

2.     The Court further **finds** and **declares** that, with respect to the *Tupa* lawsuit, Penn National's umbrella coverage of Roberts Brothers under insurance policy number UL9 0096662 is excess to any other insurance coverage available to Roberts Brothers that is applicable to those claims.

In all other respects, the Motion for Summary Judgment is **denied**.  The Court *sua sponte* **grants** summary judgment to defendants on the legal issue of whether the umbrella policy's professional services exclusion relieves Penn National of its duty to defend Roberts Brothers under that policy.

There being no further claims remaining to be litigated herein, a separate judgment will enter and this file will be closed.

DONE and ORDERED this 11th day of March, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE